IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| MARC JONATHON CRAIG,<br>　　　Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,<br>　　　Defendant. | Case No. 13CV01252 |

## Report and Recommendation

The Plaintiff, Marc Jonathon Craig (Craig), filed for Title II and Title XVI disability on October 16, 2009 alleging he became disabled on January 1, 2007. The Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security (Commissioner) denied his application on March 2, 2010. Craig then requested reconsideration on May 14, 2010, which the Defendant denied on August 11, 2010. Craig then filed a request for a hearing on October 14, 2010. After that hearing, Administrative Law Judge (ALJ) Barbara Welsch issued an unfavorable decision on November 3, 2011.  Craig requested review of that decision on January 6, 2012, but the Appeals Council denied review on March 4, 2013 while at the same time extending the time to file a civil suit for 30 days from May 7, 2013. A Complaint was timely filed in this Court on June 4, 2013. This matter having now been fully briefed and referred to the undersigned US Magistrate Judge for Report and Recommendation, the Court recommends DENIAL of the Plaintiff's Motion for Summary Judgment (D. 14) and GRANTING of the Commissioner's Motion for Summary Affirmance (D. 19).

**I**
**A**

At the time of Craig's hearing before the ALJ, he was forty years old, divorced with two children, and living at home with his mother, brother, and sister-in-law. (D. 10 at ECF pp. 43-44). Since the time Craig was held hostage as a teenager, witnessing the murder of two other hostages, he claimed to have suffered from Post Traumatic Stress Disorder (PTSD), seeing psychiatrists and other mental health professionals for outpatient treatment on and off since the age of twenty-one. (D. 10-4 at ECF p. 33; D. 10-2 at ECF pp. 23-24). He also had two psychiatric hospitalizations between 2003 and 2009, along with three inpatient admissions for chemical dependency treatment—the last such admission being to the ICU in 2009 for detoxification. (D. 10-4 at ECF p. 34). He claimed disability due to anxiety, depression, schizophrenia, PTSD, and alcohol dependency. (D. 10-1 at ECF p. 70).

After applying for benefits, Craig underwent a comprehensive psychological consultative examination with Licensed Clinical Psychologist Eric J. Baukus, PhD. Dr. Baukus noted that Craig reported his last use of alcohol was on June 4, 2009, when he was admitted to the ICU for detoxification. (D. 10-4 at ECF p. 34). Craig presented as clean and trimmed, responded at a normal conversational level, and was "cooperative, friendly, open, and submissive." (D. 10-4 at ECF p. 33). Craig reported that:

> He independently takes care of his activities of daily living such as toileting, washing, shaving, and personal hygiene needs. He gets around the neighborhood by walking and having others give him a

> ride. He takes care of chores around his mother's home. He has a Link Card and goes to the grocery store with his mother.

Id. His reported interests included "chores, watching TV, listening to music, and reading the newspaper, magazines, books, and the Bible." (D. 10-4 at ECF p. 35). Dr. Baukus concluded that Craig "has the ability to maintain appropriate social behavior and during the examination he demonstrated appropriate social behavior." Id. Dr. Baukus ultimately diagnosed Craig with a history of Polydrug Abuse; Alcohol Dependence, ongoing with multiple periods of abstention and relapse; PTSD with depression and anxiety; history of combination of alcohol and psychiatric medications; Substance-induced Mood Disorder. (D. 10-4 at ECF p. 36).

Dr. K. Lovko subsequently performed a psychiatric review of Craig, basing that review on Dr. Baukus's report, as well as several other medical sources. (D. 10-4 at ECF p. 50). Under "Categories upon which the Medical Disposition was Based," Dr. Lovko noted 12.04 Affective Disorders (Substance Induced Mood Disoder); 12.06 Axiety-Related Disorders (PTSD); and 12.09 Substance Abuse Disorders (Polysubstance Abuse, Alcohol Dependence). (D. 10-4 at ECF p. 38). However, because Dr. Lovko found no "marked" functional limitations, he determined that Craig failed to meet any of the Listings for the above noted disorders, the Paragraph B criteria requiring that mental impairments must result in "marked" restrictions in at least two specified areas. (D. 10-4 at ECF p. 73). See also 20 CFR Pt. 404, Subpt P, App 1, § 12.00(C). Having concluded that Craig did not meet the Listings, Dr. Lovko then performed a Mental Residual Functional Capacity Assessment. (D. 10-4 at ECF p. 52).

Out of twenty listed categories, Dr. Lovko found Craig was not significantly limited in sixteen of them and only moderately limited in four of

them. (D. 10-4 at ECF pp. 52-53). Additionally, he provided the following narrative:

> When seen at hospital on 6/09 blood alcohol level was about .24. 5/09 showed up at hospital with blood alcohol of .295. Cmt reported at this eval that he 'does not drink much anymore'. N. Central bx systems noted cmt to be unreliable historian. No MSS given.
>
> Cmt does not need assist in taking care of grooming or hygiene. Can make basic meals, does laundry, cleaning, feeding the cats, outdoor chores, can shop for self, can manage funds, keeps to self but reports he can get along with others. Attention is variable. Can follow written instructions well, verbal less well. No problems with authority. 3P notes he uses computer at home, watches TV and movies. Cmt partially credible. He has a history of DA/A issues and little insight regarding this. Reports no use since 6/09, but also noted when he had BAL of .259 that he doesn't drink much anymore. However, regardless, Cmt reports his functioning is improved with current meds and tx and describes ability to do variety of ADLs suggesting ability to perform SRTs.
>
> The evidence suggests that claimant can understand, remember, and carry-out simple tasks without special considerations in many work environments. The claimant can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors. The claimant can attend to task for sufficient periods of time to complete tasks. The claimant can manage the stresses involved with simple work.

(D. 10-4 at ECF p. 54).

Dr. Baukus did a second report following another psychological examination of Craig performed on July 22, 2010. (D. 10-4 at ECF p. 56). With minor variations, this second examination of Craig was substantially similar to the first. The diagnosis was also the same as before, except that Dr. Baukus did not diagnose Craig with Substance-Induced Mood Disorder as he did in the earlier examination. (D. 10-4 at ECF p. 59). Dr. Joseph Mehr, however, performing a psychiatric review after Dr. Baukus's second examination, came to

a very different conclusion from the psychiatric review previously performed by Dr. Lovko after Dr. Baukus's first examination.

Specifically, Dr. Mehr concluded that Craig satisfied the "B" criteria of the Listings. (D. 10-4 at ECF p. 73). Where Dr. Lovko found that Craig only had mild limitations in activities of daily living, Dr. Mehr found those restrictions to be "marked." Similarly, where Dr. Lovko found that Craig had only moderate limitations in maintaining concentration, persistence, or pace, Dr. Mehr found these limitations to be "marked." (D. 10-4 at ECF p. 48; D. 10-4 at ECF p. 73). Despite finding that Craig met the Listings, Dr. Mehr still concluded that Craig was not entitled to benefits due to his alcohol abuse. He noted that Craig's credibility was poor, that there was no credible evidence that Craig was not still dependent upon alcohol, and that such alcohol abuse was material to his condition. (D. 10-4 at ECF p. 75).

All of this was medical evidence before the ALJ, as well as the various medical and consultative sources relied upon by Dr. Baukus, Dr. Lovko, and Dr. Mehr. Additionally, the ALJ had before her the materials submitted by Denise King, a Licensed Clinical Counselor, who worked with Craig since October of 2010 in her capacity as a therapist at North Central Behavioral Health Systems. (D. 10-4 at ECF p. 126). Ms. King, using the Commissioner's "Mental Residual Functional Capacity Assessment," gave her own opinions of Craig's limitations. Dramatically different from Dr. Lovko's assessment, Ms. King found Craig to have "marked" limitations in sixteen out of the twenty categories, moderate limitations in three categories, and no significant limitations in only one category. (D. 10-4 at ECF p. 125-126). She also changed Craig's diagnosis to Schizoaffective disorder, bipolar type because she did not feel his other diagnoses "adequately identified his symptoms or history." (D. 10-4 at ECF p.

126). She concluded that her diagnosis was primary over any substance abuse diagnosis, and that Craig was "not able to work." Id.

At the hearing before the ALJ, Craig testified. He testified that his anxiety and depression were keeping him from working. (D. 10 at ECF p. 54). Although his medications were helpful, they made him drowsy while at the same time preventing him from sleeping. Id. Regarding household activities, his mother did most of those, doing his laundry, making meals, and most of the housework. He would go out of the house at times, but usually with his mother, he having lost his license due to DUI's and he living "out in the country in nowhere." (D. 10 at ECF p. 57). He also testified that he watched TV, fed his cat, read things around the house, used the computer, but was easily distracted. Although he had no hobbies or interests, he did manage his personal hygiene himself. Regarding his mental state, he noted he would go a few days at a time without sleep, was distracted all the time, nervous all the time, had panic attacks on a daily basis, and heard voices since his early 20s. Craig's mother also testified at the hearing to information consistent with Craig's testimony, stating that Craig basically stayed in his room and did nothing around the house and, what little he did do, was only at her prodding. (D. 10 at ECF p. 68-76).

Craig's community Support Case Manager, William Baum, from North Central Behavioral Health Systems also testified on Craig's behalf. (D. 10 at ECF pp. 81-90). He had worked in this role for Craig since June of 2010, seeing Craig about every two weeks. He opined that Craig was incapable of maintaining any type of employment, Craig rarely leaving his mother's house. When questioned about Craig's alcohol use, he stated that he only first became aware of Craig's history of alcohol abuse when preparing for the hearing before the ALJ and had never witnessed Craig use alcohol.

**B**

The ALJ ultimately denied Craig benefits. Although the ALJ found Craig to have sever impairments of "substance abuse, affective disorder (depression sometimes described as bipolar) and PTSD/anxiety," she also concluded that Craig did not meet the Listings. Specifically, she focused on the "B" criteria. Recognizing the different conclusions reached by Dr. Lovko and Dr. Mehr on this question, she gave weight to Dr. Lovko's opinion and little weight to Dr. Mehr's because Dr. Mehr's findings of marked limitations in activities of daily living and in maintaining concentration, persistence, or pace were not supported by the evidence in the record. Explaining why she reached this conclusion, the ALJ went through the categories of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation and traced out why the evidence in the record did not support the findings of Dr. Mehr regarding Paragraph "B" of the listings.

The ALJ also noted that Ms. King was not an acceptable medical source, whose opinions she gave little weight. She noted that Ms. King's "diagnoses" were inconsistent with the other medical records in the case and that her opinions were based on the subjective reports of Craig himself. She also noted that the information provided by Ms. King and the testimony of Mr. Baum seemed to ignore Craig's substance abuse issues and the information they provided was, at least in part, given by advocates/case workers desiring to help Craig obtain benefits.

Regarding Craig's credibility, the ALJ made several references to finding that he was not credible. For example, she noted the inconsistent statements made by Craig about the cessation of alcohol abuse to various treatment providers while having hospital admissions with high blood alcohol levels. She noted the more recent claims to medical providers by Craig of auditory

hallucinations since his 20s, but a lack of reference to any such claims in the medical records preceding the application for benefits, along with the fact that Craig, if his testimony was to be believed, worked for several years during his 20s and 30s while suffering from such hallucinations. She also noted that Craig's testimony regarding his functional limitations was at odds from his reports regarding the same in the objective medical records. (D. 10 at ECF p. 28-40).

Having concluded that Craig did not meet the Listings, the ALJ then concluded that Craig had a mental residual functional capacity (RFC) as follows:

> The claimant has not demonstrated he lacks the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: due to all his mental impairments combined (depression, PTSD/anxiety, substance abuse, he has moderate limitations in concentration, persistence and pace when attempting complex or detailed work so he is therefore limited to jobs that do not require complex or detailed job processes.

(D. 10 at ECF p. 35). With this RFC, the ALJ concluded Craig is capable of his past relevant work as a driver and, therefore had not been under a disability from January 1, 2007 through the date of the decision. (D. 10 at ECF p. 38-40).

## II

Craig argues that the ALJ erred in a number of ways. He argues that the ALJ erred (1) in rejecting the findings of Dr. Mehr, (2) in rejecting the opinions of Ms. King and Mr. Baum, (3) in assessing the Paragraph "B" criteria of the Listings, (4) in analyzing Craig's mental health diagnosis and treatment, and (5) in not including all of Craig's limitations supported by the medical evidence in the record. (D. 15). The Commissioner responds that substantial evidence supports the ALJ's decision and that she properly weighted the medical opinions.

## III
### A

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. See *Schmidt v Apfel*, 201 F3d 970, 972 (7th Cir 2000); *Pugh v Bowen*, 870 F2d 1271 (7th Cir 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 USC § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v Barnhart*, 297 F3d 589, 593 (7th Cir 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v Bowen*, 782 F2d 79, 82 (7th Cir 1986).

Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v Perales*, 402 US 389, 390 (1971), *Henderson v Apfel*, 179 F3d 507, 512 (7th Cir 1999). Furthermore, determinations of credibility made by the ALJ will not be overturned unless the findings are clearly erroneous. *Anderson v. Bessemer City*, 470 US 564, 573 (1985); *Imani v Heckler*, 797 F2d 508 (7th Cir 1986), cert denied, 479 US 988 580 (1986).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. See 20 CFR " 404.1566, 416.966 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a

continuous period of not less than 12 months. 42 USC '1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v Califano*, 614 F2d 142, 143 (7th Cir 1980). The factual determination is made by using a five-step test. See 20 CFR " 404.1520, 416.920. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix[1] and which meets the duration requirement;

4) is unable to perform her past relevant work; and

5) is unable to perform any other work existing in significant numbers in the national economy.

Id. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v Schweiker*, 732 F2d 605 (7th Cir 1984). The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v Heckler*, 779 F2d 1250 (7th Cir 1985); *Halvorsen v Heckler*, 743 F2d 1221 (7th Cir 1984).

---

[1] Should the claimant not qualify under one of Step Three's listed impairments, the ALJ then proceeds to Step Four to determine the claimant's Residual Functional Capacity. Pursuant to the claimant's RFC, the ALJ determines under Steps Four and Five whether she is capable of performing past work or other work available in the national economy. 20 CFR § 404.1520(e)-(g).

With one exception discussed, *infra*, all of Craig's arguments are directed at step three of the five-part test—namely, whether the ALJ's finding that Craig did not meet the Listings was supported by substantial evidence. More specifically, Craig takes issue with the ALJ's finding that he did not satisfy the Paragraph B requirement of having "marked" limitations in at least two of four functional areas. 20 CFR Pt. 404, Subpt P, App 1, § 12.00(C).

**B**

Craig argues that the ALJ erred in rejecting Dr. Mehr's opinion that Craig had "marked" limitations in activities of daily living and in maintaining concentration, persistence, or pace. The ALJ did not err in rejecting this opinion.

The ALJ had before her conflicting medical opinions regarding the Paragraph B criteria. Dr. Mehr found two marked restrictions; Dr. Lovko found none. Weighing this type of conflicting evidence from medical experts is exactly what the ALJ is required to do, see *Books v Chater*, 91 F3d 972, 979 (7th Cir1996) (pointing out that when assessing conflicting medical evidence, an ALJ must decide, based on several considerations, which doctor to believe), and this Court may not re-weigh the evidence. *Young v Barnhart*, 362 F3d 995, 1001 (7th Cir 2004). This is not a case where a treating physician's opinion was disregarded in favor of the opinion of a consulting physician. See *Books,* 91 F3d at 979; 20 C.F.R. § 404.1527(d)(2). In this case, neither of these medical experts was a treating physician. Nor is it a case where the ALJ improperly rejected an examining physician's opinion in favor of a non-examining physician's decision. See *Young v Barnhart*, 362 F3d 995, 1001-02 (7th Cir 2004); *Gudgel v Barnhart,* 345 F3d 467, 470 (7th Cir 2003). Both Dr. Mehr and Lovko reviewed the medical sources related to Craig, including the examinations of Dr. Baukus. Indeed, the only real difference in underlying documents reviewed by Dr. Mehr, as opposed to Dr. Lovko, was

Dr. Baukus's second examination of Craig, it not having been completed when Dr. Lovko performed his review.

Of course, when assigning weight (or little or no weight for that matter) to medical opinions, the ALJ must "minimally articulate" her reasons for doing so. See *Elder v Astrue*, 529 F3d 408, 414 (7th Cir 2008); *Berger v Astrue,* 516 F3d 539, 545 (7th Cir 2008). Here, she sufficiently articulated her reasons for not giving Dr. Mehr's opinions controlling weight and the weight she instead accorded Dr. Lovko's opinions. She not only noted the conflict between the opinions, but in great detail explained why she resolved that conflict in favor of Dr. Lovko. Over the course of eight detailed paragraphs, the ALJ carefully compared the other medical evidence and testimony with citations in the record to the opinions provided by Dr. Mehr, Lovko, and others. From this comparison, she concluded that Dr. Lovko's conclusions were best supported by the evidence in the record. This Court cannot find error with this conclusion without conducting its own reweighing of the evidence; something the Court is prohibited from doing. See *Schmidt*, 201 F3d at 972; *Pugh*, 870 F2d at 1271.

For example, when considering the Paragraph B limitations and discussing activities of daily living, the ALJ noted the evidence supported a finding that Craig resides at home with his family, prepares simple meals, does laundry, feeds and waters his cat, performs some yard work, grocery shops, manages his own personal finances, and attends to his own personal hygiene. (D. 10 at ECF p. 33). She found these activities supported a finding of mild, rather than marked, limitations in activities of daily living; a finding consistent with Dr. Lovko's opinion rather than Dr. Mehr's. Id. Likewise, for limitations in concentration, persistence, or pace (an area where Dr. Mehr again found marked limitations but Dr. Lovko found only moderate limitations), she cited specific facts in the record which supported Lovko's conclusions, rather than Mehr's.

While the facts cited by the ALJ in support of the weight she assigned to Dr. Lovko's opinions were in part contradicted by the testimony of Craig, his therapist, Ms. King, and Case Manager, Mr. Baum, the ALJ also explained why she did not find these sources credible or of only little weight.

## C

Regarding the information provided by Ms. King and Mr. Baum, the ALJ noted that they were not an "acceptable medical source" as defined at 20 CFR § 404.1513(a), a finding which Craig now challenges. The regulation is clear that a therapist or case manager is not an "acceptable medical source," and the ALJ therefore did not err in so finding. Id. Acceptable medical sources are limited to:

> (1) Licensed physicians (medical or osteopathic doctors);
>
> (2) Licensed or certified psychologists. Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing intellectual disability, learning disabilities, and borderline intellectual functioning only;
>
> (3) Licensed optometrists, for purposes of establishing visual disorders only (except, in the U.S. Virgin Islands, licensed optometrists, for the measurement of visual acuity and visual fields only);
>
> (4) Licensed podiatrists, for purposes of establishing impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle; and
>
> (5) Qualified speech-language pathologists, for purposes of establishing speech or language impairments only. For this source, "qualified" means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or

she practices, or hold a Certificate of Clinical Competence from the American Speech-Language-Hearing Association.

20 CFR § 404.1513(a). Accordingly, Ms. King's change of Craig's diagnosis to Schizoaffective disorder, bipolar type because she did not feel his other diagnoses "adequately identified his symptoms or history" was properly rejected under the regulations; she is not an "acceptable medical source." Id.

Although the regulations do allow consideration of a source not listed in subsection (a) on the question of the severity of an impairment and how it affects a person's ability to work, the ALJ in fact considered the opinions of Ms. King and Mr. Bauer on this question, but assigned them little weight. See 20 CFR § 404.1513(d) ("In addition to evidence from acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to-- . . . therapists . . .). In doing so, she specifically stated these sources, by virtue of their roles as advocates on behalf of Craig seeking to help Craig obtain disability benefits, should be assigned little weight. (D. 10 at ECF p. 32). Likewise, she noted that Mr. Baum was unable to provide any objective evidence regarding Craig's inability to work and seemed unaware, until he prepared for the hearing before the ALJ, that Craig had a long history of alcohol abuse. (D. 10 at ECF p. 35; D. 10 at ECF p. 84 ("that was something that I wasn't even aware that Marc has used in the past substance")).

The ALJ also noted that the Mental Residual Functional Capacity Assessment completed by Ms. King was based almost entirely on the subjective statements of Craig. (D. 10 at ECF p. 31).This conclusion is supported by the fact that the "assessment" of Ms. King differed dramatically from that performed by the "acceptable medical source," Dr. Lovko. As already noted, Ms. King found "marked" limitations in sixteen out of twenty functional categories, whereas Dr.

Lovko did not find a single "marked" limitation in these categories. This dramatic variation in functional assessments alone, especially in light of the objective medical evidence Dr. Lovko used in reaching his conclusions, is enough to call the objectivity and credibility of Ms. King into question. Giving controlling weight to the opinions of Ms. King would be akin to fully crediting the testimony of Craig himself, something the ALJ declined to do.

### D

Regarding the ALJ's credibility determination concerning Craig himself, reviewing courts afford an ALJ's credibility finding "considerable deference," and overturn it only if "patently wrong." *Prochaska v Barnhart*, 454 F3d 731, 738 (7th Cir 2006). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported ... can the finding be reversed." *Sims v Barnhart*, 442 F3d 536, 538 (7th Cir 2006) (citation omitted). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Scheck v Barnhart*, 357 F3d 697, 703 (7th Cir 2004); *Rice v Barnhart*, 384 F3d 363, 371 (7th Cir 2004).

The ALJ specifically found Craig to be "not credible" and, as required by the regulations, cited reasons in the medical record for the conclusion. (D. 10 at ECF p. 34). For example, regarding claims of auditory hallucinations, the ALJ notes that the treatment records of Dr. Sheth indicated that Craig mentioned hearing voices to him "incidentally," but Dr. Sheth concluded that Craig

15

"appared to be an unreliable historian." (D. 10 at ECF p. 31). Craig testified that his auditory hallucinations began in his early 20s, but no references are made to them in the medical records preceding Craig's efforts to secure benefits, not to mention the fact that he had sustained, long-term employment during the period of alleged hallucinations. Id. And as late as August 2, 2011, Craig denied having auditory or visual hallucinations when presenting at North Central Behavioral Health Systems with complaints of suicidal ideation. (D. 10 at ECF p. 37),

In the area of activities of daily living, Craig's testimony before the ALJ, if believed, would lead one to conclude that he was capable of doing almost nothing and that he rarely left his home, and, when he did, typically only with his mother. However, the ALJ noted that the medical records indicated that Craig lived with a girlfriend in 2009, received treatment for a rash for being exposed to the sun, and stated that he would sometimes have "1-2 beers out of the house." (D. 10 at ECF p. 31 & 35). Likewise, his reports of activities to Dr. Baukus were considerably different than his testimony before the ALJ. (D. 10-4 at ECF p. 33)

With regard to Craig's alcohol use, the ALJ noted inconsistencies between Craig's various statements on the issue and the acceptable medical sources. Craig testified that he last drank alcohol in December of 2010, but he also testified that he would have a few glasses of wine and "1-2 beers out of the house." (D. 10 at ECF p. 35). Likewise, when admitted to the hospital in 2009 stating that he had consumed "a few drinks the night before," his Blood Alcohol Level the following afternoon was .240. (D. 10 at ECF p. 31). In both of Dr. Baukus's reports, he attributed Craig's "use/abuse of alcohol with his medications" as the "source of his depression and mood disorder." (D. 10-4 at ECF pp. 36-60). Finally, Dr. Mehr characterized Craig's credibility as "poor," stating, "Denies alcohol consumption in past year but MER shows he was drunk at last hospitalized with BAL of .24.

[N]o evidence of delusions as alleged at appeal. There is no credible evidence that he is not continuing to be dependent on alcohol." (D. 10-4 at ECF p. 75). Even Dr. Lovko found Craig only to be "partially credible," and noting inconsistencies regarding Craig's alcohol use. (D. 10-4 at ECF p. 54).

E

In sum, the ALJ did not err in rejecting the findings of Dr. Mehr, (2) in rejecting the opinions of Ms. King and Mr. Baum, (3) in assessing the paragraph "B" criteria of the Listings, and (4) in analyzing Craig's mental health diagnosis and treatment. The ALJ's decisions were supported by substantial evidence, and she built an "accurate and logical bridge" between the evidence in the record and her conclusions. *Dixon v Massanari,* 270 F3d 1171, 1176 (7th Cir 2001).

Regarding Craig's final argument that the hypothetical posed by the ALJ to the Vocational Expert did not include all of the limitations supported by the medical evidence in the record, that argument is premised upon the ALJ accepting as fact the limitations as described by Ms. King and Mr. Baum. As already noted, the ALJ accorded those opinions little weight, and it was not error to do so. Consequently, her refusal to include those alleged limitations in her hypothetical was also not error.

III

For the reasons set forth, *supra*, this Court recommends DENIAL of the Plaintiff's Motion for Summary Judgment (D. 14) and GRANTING of the Commissioner's Motion for Summary Judgment (D. 19), thereby AFFIRMING the decision of the Commissioner.

The parties are advised that any objection to this recommendation must be filed in writing with the Clerk of the Court within 14 days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1).

Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc v Studio 21, Ltd*, 797 F2d 538, 539 (7th Cir 1986).

So ordered.

Entered on February 3, 2015

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE